**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| *Plaintiff,* | **CRIMINAL NO. 17-621 (DRD)** |
| v. | |
| **[8] CARLOS J. REYES-ROSARIO,** | |
| *Defendant.* | |

**OPINION AND ORDER**

On November 15, 2022, a jury found Defendant, Carlos J. Reyes-Rosario[1] guilty of five counts for conspiracy to possess with intent to distribute controlled substances within 1,000 feet of a protected location; aiding and abetting in the possession with intent to distribute heroin within 1,000 feet of a protected location; aiding and abetting in the possession with intent to distribute of cocaine base (crack) within 1,000 feet of a protected location; aiding and abetting in the possession with intent to distribute of cocaine within 1,000 feet of a protected location; and aiding and abetting in the possession with intent to distribute of marijuana within 1,000 feet of a protected location. *See* Docket No. 2023. Reyes-Rosario now moves for judgment of acquittal under Fed. R. Crim. P. 29 (Docket No. 2052). The Government filed a *Response in Opposition* thereto. *See* Docket No. 2060.

For the reasons set forth below, the Defendant's *Motion for Judgment of Acquittal Under Rule 29* (Docket No. 2052) is hereby **DENIED**.

---

[1] Pursuant to the *Indictment*, defendant, Carlos J. Reyes-Rosario is also known as "Carlitos Mea," "El Mea," "Apestoso." *See* Docket No. 4.

## I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On December 8, 2017, a Grand Jury returned a Six-Count *Indictment* against Reyes-Rosario and forty-three (43) other defendants for the following offenses: conspiracy to possess with intent to distribute controlled substances within one thousand (1,000) feet of the following protected locations: Turabo Heights Public Housing Project, Brisas del Turabo Public Housing Project, Juan Jimenez Garcia Public Housing Project, Praxedes Santiago Public Housing Project, Jardines de Cidra Public Housing Project, and Vistas de Jagueyes Public Housing Project, all facilities owned by a public housing authority and other areas nearby and within the Municipalities of Caguas, Cidra, and Aguas Buenas, Puerto Rico in violation of 21 U.S.C. §§ 841(a)(1), 846 and 860 (hereinafter, "Count One"); aiding and abetting in the possession with intent to distribute heroin within 1,000 feet of a protected location in violation of 21 U.S.C. §§ 841(a)(1); and 18 U.S.C. § 2 (hereinafter, "Count Two"); aiding and abetting in the possession with intent to distribute cocaine base (crack) within 1,000 feet of a protected location in violation of 21 U.S.C. §§ 841(a)(1); and 18 U.S.C. § 2 (hereinafter, "Count Three"); aiding and abetting in the possession with intent to distribute cocaine within 1,000 feet of a protected location in violation of 21 U.S.C. §§ 841(a)(1); and 18 U.S.C. § 2 (hereinafter, "Count Four"); aiding and abetting in the possession with intent to distribute marijuana within 1,000 feet of a protected location in violation of 21 U.S.C. §§ 841(a)(1); and 18 U.S.C. § 2 (hereinafter, "Count Five"); and possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A) (hereinafter, "Count Six"). *See* Docket No. 4.

As Reyes-Rosario decided to exercise his right to go to trial, a jury trial was held between August 22 and September 15, 2022. Upon its conclusion a jury found the defendant guilty as to Counts One through Five and not guilty as to Count Six of the *Indictment. See* Docket No. 2023.

Reyes-Rosario now moves for judgment of acquittal. *See* Docket No. 2052. Essentially, the defendant claims that "the government failed to prove beyond a reasonable doubt all the elements of the offenses in Counts 1 and 2 of the Indictment . . ." Docket No. 2052 at ¶ 4. As such, "because acquittal is warranted as to Count 1, which charges a conspiracy, and for the reasons similar to that of Count 2's acquittal, Count 3, 4 and 5 must follow and should also be dismissed." *Id.*

In turn, the Government argues that a denial of the defendant's request is warranted as "[i]n this case, there was ample evidence from which the jury could conclude that the government proved each element of the offenses charged in Counts One through Five." Docket No 2060 at p. 2. But ultimately, a motion for acquittal should de denied unless "all reasonable inferences to be drawn from the evidence, both taken in the light most favorable to the government, are insufficient for a rational factfinder to conclude that the prosecution has proven, beyond a reasonable doubt, each of the elements of the offense." United States v. Pimental, 380 F.3d 575, 584 (1st Cir. 2004).

## II.     LEGAL STANDARD

### A.     *Motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure*

Federal R. Crim. P. 29 provides that the Court, upon defendant's request and after the close of the government's case, must enter a judgment of acquittal on any offense for which the evidence is insufficient to sustain a conviction. "The [trial] tribunal must discern whether, after assaying all the evidence in the light most flattering to the government, and taking all reasonable inferences in its favor, a rational fact finder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime." United States v. Hernandez, 146 F.3d 30, 32 (1st Cir. 1998)(citing United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)).

In analyzing a Rule 29 motion, "[v]iewing the evidence in the light most flattering to the jury's guilty verdict, [the Court must] assess whether a reasonable factfinder could have concluded that the defendant was guilty beyond a reasonable doubt." United States v. Lipscomb, 539 F.3d 32, 40 (1st Cir. 2008). Thus, "Rule 29 requires that a deciding court defer credibility determinations to the jury." Hernández, 146 F.3d at 32 (citing O'Brien, 14 F.3d at 706); United States v. Walker, 665 F.3d 212, 224 (1st Cir. 2011) ("we take the facts and all reasonable inferences therefrom in the light most agreeable to the jury's verdict."). Additionally, the Court "must be satisfied that 'the guilty verdict finds support in a plausible rendition of the record.'" United States v. Pelletier, 666 F.3d 1, 12 (1st Cir. 2011)(quoting United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006)).

This standard is a "formidable" one, especially as "[t]he government need not present evidence that precludes every reasonable hypothesis inconsistent with guilt in order to sustain a conviction." United States v. Loder, 23 F.3d 586, 589-90 (1st Cir. 1994)(internal quotation marks omitted). Moreover, there is no "special premium on direct evidence." O'Brien, 14 F.3d at 706. "[T]he prosecution may satisfy its burden of proof by direct evidence, circumstantial evidence or any combination of the two." Id. (citing United States v. Echevarri, 982 F.2d 675, 677 (1st Cir. 1993)). Expressed in alternate fashion, "no premium is placed on direct as opposed to circumstantial evidence; both types of proof can adequately ground a conviction." United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992). As to evidentiary conflicts, "the trial judge must resolve all evidentiary conflicts and credibility questions in the prosecution's favor; and moreover, as among competing inferences, two or more of which are plausible, the judge must choose the inference that best fits the prosecution's theory of guilt." United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995); see Hernández, 146 F.3d at 32 (the trial court is required to "consider all the

evidence, direct and circumstantial, and resolve all evidentiary conflicts in favor of the verdict.")(citing <u>United States v. Carroll</u>, 105 F.3d 740, 742 (1st Cir. 1997)). On the other hand, "[t]he court must reject only those evidentiary interpretations that are unreasonable, unsupportable, or only speculative and must uphold any verdict that is supported by a plausible rendition of the record." <u>United States v. Ofray Campos</u>, 534 F.3d 1, 31-32 (1st Cir. 2008); *see also* <u>United States v. Cruz Laureano</u>, 404 F.3d 470, 480 (1st Cir. 2005) (urging the trial court "not to believe that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that the guilty verdict finds support in a plausible rendition of the record.")(citing <u>United States v. Gómez</u>, 255 F.3d 31, 35 (1st Cir. 2001)). Nevertheless, "despite the prosecution-friendly overtones of the standard of review, appellate oversight of sufficiency challenges is not an empty ritual." <u>United States v. De La Cruz Paulino</u>, 61 F.3d 986, 999 n.11 (1st Cir. 1995).

### III.    LEGAL ANALYSIS

***A.***     ***Count One: Conspiracy to possess with intent to distribute controlled substances within one thousand (1,000) feet of protected locations, a violation of 21 U.S.C. §§ 841(a)(1), 846 and 860.***

In order for a jury to have found Reyes-Rosario guilty as to Count One of the *Indictment*, the Government had to prove beyond a reasonable doubt that (1) the agreement specified in the indictment, and not some other agreement or agreements, existed between at least two people to possess with intent to distribute controlled substances either actually or constructively in or on, or within 1,000 feet of, a public housing facility owned by a public housing authority, and that the defendant willfully joined in that agreement with a specific intent to distribute the controlled substances over which he had actual or constructive possession. As specified in the jury instructions, "[a] person's intent may be inferred from the surrounding circumstances." *Jury Instruction No.* 21, Docket No. 2026 at p. 27.

"There are no particular formalities that attend this showing: the agreement may be express or tacit and may be proved by direct or circumstantial evidence." United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993). "Such evidence may include the defendants' acts that furthered the conspiracy's purposes." United States v. McDonough, 727 F.3d 143, 156 (1st Cir. 2013). In fact, "[t]he requisite intent may also be shown through the knowing provision of peripheral services that aid in one of a conspiracy's objectives, like the objective to avoid police detection." United States v. Paz-Alvarez, 799 F.3d 12, 25 (1st Cir. 2015). But ultimately, "[a] drug conspirator need not know all of the details of the conspiracy, but it is hard to imagine how someone furnishing a peripheral service to a drug conspiracy could be deemed to 'join' that conspiracy unless he knew both that the drug conspiracy existed and that the peripheral service being furnished was designed to foster the conspiracy." United States v. Garcia-Torres, 280 F.3d 1, 4 (1st Cir. 2002) (internal citations omitted).

During trial, the Government relied on several witnesses in order to demonstrate the existence of the conspiracy. For instance, the jury heard the testimony of witness JCC, a member of the conspiracy who testified at length as to the origins and inner workings of the drug conspiracy. He testified as to the controlled substances the gang sold at its drug points, as alleged in the *Indictment*, and he estimated the volume of drugs sold by the organization.

Specifically, he explained how his street gang controlled drug sales points throughout public housing projects and neighborhoods located in the municipalities of Caguas and Cidra. As such, he explained the background of the operation in public housing project, Jardines de Cidra, where Reyes-Rosario lived and would eventually become a gang leader. Particularly, JCC testified

6

that once he was arrested, the drug organization leader, namely, Néstor Torres-Delgado, "El Burro" designated Reyes-Rosario as the new leader of the Jardines de Cidra drug point.[2]

According to JCC[3], on around December 2020, a few months after he was sentenced and released, he received a call from a man who identified himself as Carlos "El Mea". During the telephone conversation he was told that the leaders of the organization were going to gather some money to give him so that he would not snitch them.[4]

Witness HOO also took the stand on behalf of the Government. The jury heard testimony as to Reyes-Rosario's membership in the drug conspiracy. According to HOO, Reyes-Rosario became a runner of the organization in Jardines de Cidra housing project near the end of 2015. *See*

---

[2] BY MR. EATON [USA]:
Q. [JCC], what happened to the leadership in Jardines after your arrest?
A. Well, while in prison with Puchu in Atlanta he told me that El Burro had put somebody new there.
Q. And who is that?
A. Carlitos, El Mea.
Q. And was Carlitos, El Mea, in leadership when you went to Jardines?
A. No.
*Transcript of Jury Trial, Thursday, August 25, 2022*, Docket No. 1942 at p. 91.

[3] As revealing the identity of cooperating witnesses against a violent street gang has raised security concerns, due to threats they have received by other members of the organization, the Court will refrain from identifying these witnesses with their full names throughout this *Opinion and Order.*

[4] BY MS. CORDERO-ROMO [USA]:
Q. You started explaining what happened when you received that call. Please start again and explain to us what happened.
A. Well, as I said, I was arriving at the house of the aunt and uncle of a girl that I was with for some time and when we got to the house that we were parking I received a phone call. The person tells me that he's Carlos El Mea and he tells me, Oh, are you [JCC]? I said yes. And he tells me then that it's him and he says, "Hey, El Burro, Yuyo, me and the leaders in the indictment are gonna make up a little horse and give you a couple of bucks so you won't snitch."
Q. And to be clear, before that you didn't meet Carlos El Mea before, right?
A. No.
Q. And what is a *caballo*?
A. Like join money between several persons.
Q. What did you do when you received this offer?
A. He told me that he was gonna call me later to tell me how much money it was in total, that he was also going to send the money to the person who contacted him with me. There we talked, we said a couple of things, and we hang up, we hung up. And so before we hung up I said, "Hey, you know that if you sit down you know I'm gonna break you." He said that he didn't care about the others that he cared about me.
Q. What did you take that to mean?
A. Well, that they were worried that I would sit and talk about them.
*Transcript of Jury Trial, Friday, August 26, 2022*, Docket No. 1957 at pp. 62-64.

*Transcript of Jury Trial, Thursday, September 1, 2022*, Docket No. 1990 at p. 35. Particularly, HOO learned of Reyes-Rosario's position as runner of the organization during a gathering to play dominoes. As he was watching the other men play, "Carlos "El Mea" told [him], look at the gun that I bought. And I looked, and he said, because I have to be ready because Angel "Esquilin" Jiménez put me as a runner, so I have to be ready." *Id.* at p. 36.

MRR was also called as a witness on behalf of the Government. The jury heard that she was a resident of Jardines de Cidra public housing project who was kicked out of her home by Reyes-Rosario when the gang suspected that she was cooperating with the police. According to MRR, "Esquilin" was in charge of the drug point at Jardines de Cidra for several years.[5] Once "Esquilin" was arrested, Reyes-Rosario took charge of the drug point.[6] "Being in charge means being the big shot, that you give commands at the drug point, that you distribute your employees, you pay your employees their wages, the employees are selling drugs, and you do the tally because that's just like having a job." *Transcript of Jury Trial, Wednesday, September 7, 2022*, Docket No.

---

[5] Q. Over the years, what would "Esquilin" as the big shot do there?
A. Well, to give orders also.
Q. Give orders to who?
A. Those who would work for him, the sellers.
Q. Who was in charge -- to your knowledge, who was in charge of Jardines above "Esquilin"?
A. Nelson.
Q. Is that what you call him, Nelson?
A. No, "El Burro".
*Transcript of Jury Trial, Wednesday, September 7, 2022*, Docket No. 2007 at p. 24.

[6] BY MR. EATON:
Q. When there was a new big shot, who was that?
A. They put Carlitos "El Mea" there. Carlitos Reyes-Rosario, Carlitos "El Mea", because he would stink, just like people say.
Q. Just like you would see, visually see "Esquilin" out in Jardines, would you also see Carlos "El Mea"?
A. Yes.
Q. And after he was "bigshote", what would he do, Carlos "El Mea"?
A. Well, same thing. He would give orders, although he wasn't as strict, but the same thing. He would distribute. He would give the schedules, you know. He was the darling there. He was the big shot.
*Id.* at p. 31.

8

2007 at p. 18. MRR further testified that she could see the activities related to the drug point because they were held outdoors.[7]

According to MRR, she watched Reyes-Rosario holding meetings, resolving issues between residents, while also overseeing the drug point. In fact, she recorded a video of the Defendant talking to the drug dealer at the Jardines de Cidra drug point. While the dealer counted money, they discussed calling "Blake." "Blake" was identified as a drug supplier within the drug organization by JCC during his testimony.[8]

The jury also heard testimonies from law enforcement officers who seized drugs from the defendant and his coconspirators. Namely, Agents José Pedraza and Carlos Morera explained in detail as to the items occupied during an intervention that took place on March 1st, 2016. According

---

[7] BY MR. EATON:
Q. So ma'am, where is the drug point in Jardines?
A. There's two places.
Q. Go ahead.
A. Well, specifically in the stairs of a building and in the tarp.
Q. How many years did you live there?
A. Well, since -- well, a lot. I mean, like, 22 years that I lived there.
Q. Was there ever not a drug point there over those 22 years?
A. No. There's always been.
Q. Over those 22 years, could you see that drug point with your own two eyes?
A. Of course.
Q. And how did they do sales at that drug point? Did they hide them?
A. No; outdoors.
Q. So you could see that?
A. Of course. Everybody could see it.
*Id.* at pp. 21-22.

BY MR. EATON:
Q. Why would they talk in front of you like that?
A. They would talk like that in front of everybody. It
wasn't just simply me.
*Id.* at p. 23.

[8] Q. Do you know someone named Bebo?
A. Yes, Bebo Blake.
Q. Who was that?
A. He was a runner and also supplied pounds of marijuana and stuff.
*Transcript of Jury Trial, Thursday, August 25, 2022*, Docket No. 1942 at p. 53

to Agent Pedraza, they were conducting surveillance close to the Jardines de Cidra Housing Project.[9] While in surveillance, the agents saw Reyes-Rosario and Jovany Corredor-Molina meeting another car to receive a large bag of heroin.[10] While on their way back to Jardines de Cidra, the agents intervened the vehicle, and realized the coconspirator attempted to dispose of the heroin. 602 decks of heroin were seized from the car. *See Transcript of Jury Trial, Tuesday, August 30, 2022*, Docket No. 1971 at p. 135. The Defendant has $720.00 in cash seized during the intervention. *Id.* at p. 39. Reyes-Rosario even admitted that the drug was theirs and not of the woman who was accompanying them. *See* Gov. Exhibit No. 56.

*Opibus* evidence as to the location of the drug point and drug sales within Jardines de Cidra was provided to the jury. Additionally, Wanda Vazquez, an employee of the Puerto Rico Department of Housing was called as a witness in order to inform the jury as to the fact that Jardines de Cidra is a public housing project owned by a public housing authority. The jury also saw physical evidence, such as the drugs and the firearm that were occupied (Gov. Exhibit Nos. 5-30), and videos of the search and seizure of the Cidra house, and photographs and videos of the transactions.

---

[9] Q. And do you remember what you were doing on March 1st of 2016?
A. I was with Sergeant Carlos Morera-Arroyo.
Q. Where were you all? A. In the town of Cidra.
Q. What were you doing?
A. We were investigating. We were investigating the organization of Jardines de Cidra.
Q. And what were you doing as part of that investigation? Tell the jury.
A. We were doing surveillances, and we were doing -- and we were following individuals.
Q. Do you remember exactly where you were doing the surveillance?
A. Close to Jardines de Cidra Housing Project.
*Transcript of Jury Trial, Tuesday, August 30, 2022*, Docket No. 1971 at p. 9.

[10] A. On that road, we were following a vehicle, a Nissan Sentra vehicle, burgundy, and we were following it. Close to it, there was an empty business, a business location, which is this one (Drawing). When we were following this burgundy vehicle, there was a gray Nissan parked there, and the burgundy vehicle stops right next to the other -- to the gray Nissan vehicle. The driver of the gray Nissan then hands over a bag to the passenger of the burgundy vehicle. The Nissan moves out. We were going to follow it little by little, and the vehicle turns left toward the town of Cidra. When we were following it, further down the road there was a patrol car of ours. And when we got close to the AMCOR factory, there, the vehicle started to stop.
*Transcript of Jury Trial, Tuesday, August 30, 2022*, Docket No. 1971 at p. 11.

Finally, four (4) forensic chemists were brought as expert witnesses in order to authenticate the drugs that were occupied as to this conspiracy. First, Patricia Burn-Posada, a forensic chemist for the Drug Enforcement Administration (hereinafter, "DEA") in Miami, Florida, was called to testify as to the findings obtained when examining four foil packages containing brown powder. She concluded that "there is heroin with the weight [] of 0.53 grams" without packaging. *Transcript of Jury Trial, Tuesday, September 6, 2022*, Docket No. 2002 at pp. 80-81; *see* Gov. Exhibit No. 31.

Second, Marsha Collins, a former[11] senior forensic chemist with the DEA laboratory in Miami, Florida. According to the tests performed on Government Exhibit No. 20 "contain[ed] cocaine base as well as phenyltetrahydroimidazothiazole [i.e., levamisole, dexamisole, or tetramisole] and caffeine . . . the total weight without any of the packaging is 23 grams, and I counted 200 vials in this package." *Transcript of Jury Trial, Friday, September 2, 2022*, Docket No. 1994 at pp. 12-13. Collins further testified that, "[f]or Exhibit 20, the total weight of just the powder, and no vials, was 23 grams." And there were 200 vials. *Id.* at pp. 14-15. As to Government Exhibit No. 21, Collins counted 725 vials inside, and [] identified it as cocaine base[12] also with phenyltetrahydroimidazothiazole and caffeine. The total weight without any of the packaging was 99 grams." *Id.* at p. 13. Therefore, the "total weight of just the powder with no vials or other packaging to be 99 grams, and there were 725 vials." *Id.* at p. 15.

Third, the Government called María Andreu, a senior forensic chemist for the DEA, Southeast lab in Miami, Florida, as an expert witness. As to Government Exhibit No. 29, she found

---

[11] Although Collins is now supervisor to forensic chemists, she still testifies as to the findings she made when she was a forensic chemist.
[12] Q. What's cocaine base?
A. Cocaine base is cocaine without an additional salt attached to it.
Q. What is cocaine base commonly referred to as?
A. It can be referred to as crack cocaine or other names as well.

a net weight of 29.3 grams, namely, the weight of the entire exhibit or substance without any wrapping whatsoever, with a component of THC, which is basically marijuana. *See Transcript of Jury Trial*, *Wednesday, September 7, 2022*, Docket No. 2007 at pp. 99-100.

Lastly, Monica Torres-Perez, a forensic chemist in the U.S. Custom and Border Protection in the laboratory LLS Laboratory was brought as an expert witness. Her testimony consisted in identifying Government Exhibit No. 19 which contained heroin, cocaine, and marijuana. *See Transcript of Jury Trial,* Docket No. 1976 at pp. 84-85.[13]

Reyes-Rosario essentially claims that an acquittal as to Count One is warranted as "[n]ot a single law enforcement agent, informant, cooperating codefendant, nor other type of witness, testified as to Mr. Reyes-Rosario having willfully and knowingly joined the conspiracy." Docket No. 2052 at ¶ 22. More importantly, that "[t]he Government relied heavily on the testimony of two (2) of its witnesses, [HOO] and [MRR], to try to involve Mr. Reyes-Rosario in the conspiracy. These two witnesses mentioned that Mr. Reyes-Rosario was a member of conspiracy charged in Count 1." *Id.* at ¶ 20. As such, these were lay witnesses whose testimony was largely based on inadmissible hearsay. *See id.* Therefore, the Government failed to prove beyond a reasonable doubt, Reyes-Rosario willful and knowing joinder to the conspiracy. *See id.*

However, the Court finds that the aforementioned and overwhelming amount of circumstantial and direct evidence presented by the Government as to the Defendant's participation in the conspiracy is sufficient for a reasonable factfinder to conclude that the prosecution proved beyond a reasonable doubt, that Reyes-Rosario willfully and knowingly joined

---

[13] A. On the certificate of analysis performed to this case, I reported on the Item 1 that had the 602 green foils, 4.54 grams on the 20 units analyzed, and that weight included the green foil. And the weight of the not-analyzed sample was 158.1 grams on the 582 samples not analyzed. And that weight included the green foil, the powder, and the packing. So it included three types of packaging for preservation. On Item Number 2, there were four items analyzed of 28 received . . . And the weight was 2.04 grams in four units and -- analyzed, and 12.59 grams in 24 units not analyzed. And on the third one, it was just one unit analyzed, and it contained 0.67 grams in that unit.

a drug trafficking conspiracy with the intent to distribute controlled substances within 1,000 feet of a public housing project. In any event, the jury was assigned to determine the weight to be given to the evidence presented in trial.

**B.**      ***Counts Two through Five: Aiding and Abetting in the Possession with Intent to Distribute Heroin, Cocaine Base, Cocaine and Marijuana, all in violation of 21 U.S.C. §§ 841(a)(1), 860; and 18 U.S.C. § 2.***

In order for the jury to find the defendant guilty of Counts Two through Five, the Government had to prove that Reyes-Rosario possessed the controlled substance or aided and abetted with others to do so, either actually or constructively; that he acted knowingly or intentionally; and that the possession was within 1,000 feet of a public housing facility owned by a public housing authority.

During trial, the jury heard testimony as to seizures of drugs from coconspirators contemporary with Reyes-Rosario's participation in the conspiracy. Additionally, Sergeant Morera and Agent Acevedo were called as witnesses and testified in detail as to the seizure of individually packed marijuana, crack, heroin, and powder cocaine from Jardines de Cidra. For instance, Agent Acevedo testified that on February 6th, 2017, "Officer Pedraza received information from a confidant that there was in Jardines de Cidra Housing Project, there was a fugitive named Garced was selling drugs there at the housing project . . . Pedraza then gives the information to Sergeant Morera, and then Sergeant Morera makes the plan to be able to perform the arrest." *Transcript of Jury Trial, Tuesday, September 6, 2022*, Docket No. 2002 at pp. 5-6. Upon the arrest of coconspirator, Felix Garced a.k.a. "Chandel," "40 bags of cocaine, 31 of marijuana, 20 decks of heroin, and 16 orange-caps vials of crack, and $1,092 in cash" were occupied. *See id.* at p. 9.

The jury also heard the testimony of Agent Carlos Carrasco who testified that on February 9, 2017, he was in an unmarked vehicle with Sergeant Morera when they are leaving the area of the drug point. They see a vehicle is coming out with full tinted windows and they decide to follow it to see if they could identify who was driving the vehicle. *See Transcript of Jury Trial, Wednesday, August 31, 2022*, Docket No. 1976 at pp. 9-10. As they lose sight of the vehicle, when they are passing through the Valle Tolima development, they see a gray Toyota Yaris that is parked with two individuals. They decide to surveil the vehicle, when approximately five minutes later, they saw an exchange between the passenger of the Toyota Yaris and the taxi of a brown paper bag. *See id.* at p. 10-11. The Toyota Yaris travelled to the town of Cidra, and stopped at an EcoMaxx gas station. The Agents surveilled and took a video of the occurrence. *See* Gov. Exhibit No. 7. Essentially, a white Mirage arrived at the gas station and parked next to the Toyota Yaris. The brown paper bag is then passed from the Toyota Yaris to the white Mirage. *See id.* at p. 12-14. Then the vehicles left the gas station. The Toyota Yaris turned to Caguas and the white Mirage turned right to Cidra. *See id.* at p. 14. Officers in a patrol car ordered the white Mirage to stop. As the white Mirage accelerated and took off, a persecution ensued. *See id.* at p. 15. Meanwhile Agent Carrasco and Sergeant Morera "went on to the area where the fellow officer had told [them] that a bag had been thrown out." *Id.* at p. 17. "Inside the bag, there was cylindrical vials with purple caps on them that had white dust in them, and there was also some vials that had orange caps[14], and

---

[14] A. Well, the paper bag with the vials that had the purple caps, these Ziploc bags, and the other vials with the orange caps.
Q. How many vials of purple caps were seized that day by yourself?
A. 725.
Q. And how many with orange caps?
A. 200.
Q. At some point, did you sign a receipt when you turned over this evidence to ATF?
A. Correct.
*Transcript of Jury Trial, Wednesday, August 31, 2022*, Docket No. 1976 at p. 37.

there were Ziploc pressure-sealed baggies, and there was also, like, a supermarket bag from Econo." *Id.* at p. 18.  The bag was seized and they proceeded to go towards the fellow officers who had an accident while in pursuit. *See id.* Upon arriving to the accident area, Officers Andujar and Feliciano arrived five (5) to ten (10) minutes later with coconspirator, Christian Centeno-Rosado a.k.a. "Espigao" who had been arrested during the intervention. *See id.* at p. 19. The jury was shown the evidence seized by the agents that day. *See* Gov. Exhibit Nos. 24-25.

Specifically the Government presented evidence as to an intervention against Reyes-Rosario and Jovany Corredor-Molina after receiving a large bag of heroin and attempting to introduce it to Jardines de Cidra. *See supra* at p. 11-12. As to this occurrence, Reyes-Rosario argues that he "was not detained, arrested, nor charged for anything related to heroin possession," but a "third person, Corredor-Molina, who was allegedly found in possession of heroin and was arrested for this." Docket No. 2052 at p. 8. But ultimately, no probable cause was found after a hearing was held. *See id.* In sum, "Corredor-Molina was not a part of the conspiracy charged in this case; he was not a coconspirator. Thus, it cannot be said that any conduct attributed to Corredor-Molina [] may be interpreted as relating to Reyes-Rosario, was in furtherance of the conspiracy charged in this case nor in furtherance of Count 2." *See id.* Lastly, the Defendant claims that "the intervention occurred more than 1,000 feet away from any protected location . . ." therefore, the Government failed to prove beyond a reasonable doubt said element from Count Two, namely, aiding and abetting in the possession with intent to distribute heroin within 1,000 feet of a protected location. *Id.* at ¶ 10.

Notwithstanding, the Defendant fails to recognize that the evidence presented to the jury was sufficient to find him guilty beyond a reasonable doubt for aiding and abetting others to possess with intent to distribute controlled substances, including heroin, even in the absence of

15

him possessing drugs. Keep in mind that the Government may prove that a person joined a conspiracy by circumstantial evidence. As the First Circuit has explained, "[t]here are many ways to show that a defendant intended to join and advance a conspiracy, even where the defendant never actually handled the drugs. The defendant's intention to join 'need not be express, but may be shown by circumstantial evidence.' Hence, 'acts that furthered the conspiracy's purposes' may be evidence of the intent to join." <u>Paz-Alvarez</u>, 799 F.3d at 25 (internal citations omitted). As stated above, MRR testified she watched Reyes-Rosario holding meetings, resolving issues between residents, and overseeing the drug point. In fact, she recorded a video of the Defendant talking to the drug dealer at the Jardines de Cidra drug point. *See* Gov. Exhibit No. 126-11. Therefore, it was reasonable for a jury to conclude that the Defendant's actions reflect intent to help the drug organization dealings in Jardines de Cidra and throughout the Caguas area.

In the alternative, the jury was instructed that if they found Reyes-Rosario guilty beyond a reasonable doubt as to the conspiracy count (Count One), "then [they] may also, but [] are not required to, find him guilty of the substantive crime charged in Counts Two (2), Three (3), Four (4), Five (5), or Six (6) . . ." *Jury Instructions*, Docket No. 2026 at pp. 29-30. However, in order to do so, the jury must have found all of the following elements beyond a reasonable doubt, even if he did not personally participate in the acts constituting the crime or did not have actual knowledge of them. Namely,

> First, that someone committed the substantive crime charged in Count (1) one, conspiracy to possess with intent to distribute controlled substances as related to Carlos Reyes-Rosario;

> Second, that the person you find actually committed the charged substantive crime was a member of the conspiracy of which you found that Carlos Reyes-Rosario was a member;

> Third, that this co-conspirator committed the charged substantive crime in furtherance of the conspiracy;

Fourth, that the defendant was a member of this conspiracy at the time the charged substantive crime was committed and had not withdrawn from it; and

Fifth, that the defendant could reasonably have foreseen as a necessary or natural consequence of the unlawful agreement that one or more of his co-conspirators would commit the charged substantive crime.

*See id.*; *see also* <u>Pinkerton v. United States</u>, 328 U.S. 640, 643, 66 S. Ct. 1180, 1182, 90 L. Ed. 1489 (1946). Here, the jury heard testimony as to the operations of the drug points in broad daylight, and saw video evidence in support thereof. They were the triers of fact who evaluated the evidence and made determinations as to its weight and the credibility of the witnesses. As a matter of fact, the jury, exercising its duty, found Reyes-Rosario not guilty as to Count Six of the *Indictment*. Therefore, the Court finds that a reasonable jury could have concluded that Reyes-Rosario and his coconspirators would sell the controlled substances charged in Counts Two through Five in furtherance of the drug trafficking conspiracy while he was a member of the organization.

## IV.    CONCLUSION

For the reasons stated above, the Court finds that the Government presented sufficient evidence whereupon a reasonable juror could find Defendant Carlos J. Reyes-Rosario guilty on Counts One through Five of the *Indictment*. Accordingly, Reyes-Rosario's *Motion for Judgment of Acquittal Under Rule 29* (Docket No. 2052) is hereby **DENIED**. Sentencing will proceed as scheduled.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 12th day of December, 2022.

*S/Daniel R. Domínguez*
Daniel R. Domínguez
United States District Judge

17